UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TATYANA LYSYY, et al.,<br><br>                  Plaintiffs,<br><br>      v.<br><br>DEUTSCHE BANK NATIONAL<br>TRUST COMPANY, et al.,<br><br>              Defendants. | CASE NO. C24-0062JLR<br><br>ORDER |

## I.    INTRODUCTION

In this order, the court resolves Plaintiffs Tatyana Lysyy and Vasiliy Lysyy's (together, "Plaintiffs") claims for quiet title and for violation of the automatic bankruptcy stay under 11 U.S.C. § 362(k).  Plaintiffs are represented by Richard L. Pope, Jr., of Lake Hills Legal Services PC.  (*See* Dkt.)  Defendants Deutsche Bank National Trust Company, as Trustee, on behalf of the holders of the Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2007-1 (the "Trust" or "Trust # 2"); Select

ORDER - 1

Portfolio Servicing, Inc. ("SPS"); Safeguard Properties, LLC ("Safeguard"); and Residential RealEstate Review, Inc. ("RRR") (together, "Defendants") are represented by Midori R. Sagara of Buchalter LLP.  (*See id.*)  On September 4, 2025, the court heard argument on the parties' oral motions for judgment as a matter of law[1] on Plaintiffs' quiet title claim.  (*See* 9/4/25 Min. Entry (Dkt. # 159).)  On December 9 and 10, 2025, the court presided over a bench trial on Plaintiffs' § 362(k) claim for violation of the automatic bankruptcy stay.  (*See* 12/9/25 Min. Entry (Dkt. # 168); 12/10/25 Min. Entry (Dkt. # 169).)  Below, the court summarizes the relevant procedural background; considers the parties' motions for judgment as a matter of law on Plaintiffs' quiet title claim; and issues findings of fact and conclusions of law on Plaintiffs' § 362(k) claim.

## II.   PROCEDURAL BACKGROUND

This matter arises from Ms. Lysyy's default on a loan that was secured by Plaintiffs' property in Auburn, Washington (the "Property").  The court reviewed the procedural background of this case in its orders granting Defendants' motions for summary judgment.  (*See* 4/3/24 Order (Dkt. # 54); 5/28/24 Order (Dkt. # 67); 2/20/25 Order (Dkt. # 100).)  The court expects that the reader is familiar with these orders and therefore focuses here on the procedural background relevant to this order.

Plaintiffs filed this action *pro se* in King County Superior Court on July 20, 2022, with the assistance of their friend and advisor, non-party Peter Kuzmenko.  (*See* Compl.

---

[1] Although the parties moved for a "directed verdict," the proper term under the Federal Rules of Civil Procedure is "judgment as a matter of law."  *See Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 111 (2d Cir. 1996) (so explaining).

ORDER - 2

(Dkt. # 1-2); T. Lysyy at 41.[2])  They amended their complaint, again with the assistance of Mr. Kuzmenko, on July 29, 2022.  (*See* Am. Compl. (Dkt. # 1-3).)  Mr. Pope appeared as counsel on behalf of Plaintiffs in March 2023.  (*See* 2/26/24 Pope Decl. (Dkt. # 35) ¶ 5.)  Defendants removed the action to this court on January 12, 2024.  (Not. of Removal (Dkt. # 1).)

On April 3, 2024, the court denied Plaintiffs' motion to remand, granted in part Defendants' first motion for summary judgment, and dismissed with prejudice Plaintiffs' claims for civil conspiracy, trespass, theft, conversion, wrongful foreclosure, outrage, and violations of the Washington Deed of Trust Act ("DTA"), the Washington Consumer Protection Act ("CPA"), the Washington Foreclosure Fairness Act ("FFA"), and the federal Fair Debt Collection Practices Act ("FDCPA").[3]  (4/3/24 Order (Dkt. # 54) at 18-30.)  The court also ordered Plaintiffs to show cause why the court should not dismiss their 42 U.S.C. § 1983 due process claim for failure to name a state actor and their § 362(k) claim for failure to present admissible evidence that they suffered damage due to Defendants' alleged actions.  (*Id*. at 30-32.)  Shortly thereafter, Plaintiffs moved the court to reconsider its decision to grant summary judgment in Defendants' favor on the trespass and CPA claims.  (*See* MFR (Dkt. # 60).)  On May 28, 2024, the court denied Plaintiffs'

---

[2] The court cites trial testimony by identifying the testifying witness and the page on which the testimony can be found.  The trial transcripts are available on the court's docket at Docket Nos. 177-78.

[3] Plaintiffs brought 19 claims for relief in their amended complaint.  (*See* Am. Compl. at 9-23.)

ORDER - 3

motion for reconsideration, dismissed Plaintiffs' § 1983 due process claim, and allowed Plaintiffs' § 362(k) claim to proceed. (*See generally* 5/28/24 Order (Dkt. # 67).)

On July 18, 2024, Plaintiffs failed to attend their depositions. (*See* 8/16/24 Order (Dkt. # 75) at 1-2 (discussing the events of July 18, 2024).) Later that same day, Plaintiffs' attorney, Mr. Pope, moved to withdraw. (Mot. to Withdraw (Dkt. # 70).) The court granted counsel's motion on August 6, 2024, and advised Plaintiffs that they would be proceeding *pro se* from that point forward. (8/6/24 Order (Dkt. # 72).)

On August 16, 2024, Defendants moved to compel Plaintiffs to appear for their depositions and sought sanctions. (MTC (Dkt. # 73); *see also* 8/16/24 Order (ordering Plaintiffs to show cause why the court should not grant Defendants' motion).) On September 25, 2024, the court granted the motion to compel and awarded Defendants $4,500 in attorneys' fees and costs that Defendants incurred because of the cancelled depositions. (9/25/24 Order (Dkt. # 83).) Defendants took Plaintiffs' depositions[4] on October 11, 2024. (*See* 11/26/24 Sagara Decl. (Dkt. # 89) ¶¶ 3-4.)

Defendants filed their second motion for summary judgment on November 26, 2024. (2d MSJ (Dkt. # 88).) Mr. Pope reappeared in the case and filed a response on behalf of Plaintiffs. (NOA (Dkt. # 96); 2d MSJ Resp. (Dkt. # 97).) On February 20, 2025, the court granted Defendants' motion for summary judgment on Plaintiffs' claims for invasion of private affairs, declaratory relief regarding laches and the statute of limitations, and an injunction, and denied Defendants' motion for summary judgment on

---

[4] The Lysyys were assisted by a Ukrainian interpreter for their depositions and the hearings at which they appeared.

ORDER - 4

Plaintiffs' quiet title and § 362(k) claims.  (2/20/25 Order at 23.)  With respect to the § 362(k) claim, however, the court granted summary judgment to Defendants on Plaintiffs' claims for damages arising from loss or damage to personal property and loss of ability to use, rent out, or sell the Property, for lack of evidence supporting those damages.  (*Id*.)

In March 2025, the parties asked the court to appoint a settlement judge to preside over a judicial settlement conference.  (Request (Dkt. # 101).)  The court granted the request and appointed the Honorable Michelle L. Peterson, United States Magistrate Judge, to serve as settlement judge.  (3/21/25 Order (Dkt. # 102).)  Plaintiffs, however, failed to appear at the settlement conference.  (*See* 5/7/25 Min. Entry (Dkt. # 111).)  Consequently, Magistrate Judge Peterson ordered Plaintiffs to show cause why they should not be held in civil contempt and scheduled a contempt hearing.  (5/8/25 Order (Dkt. # 112).)  The court appointed *pro bono* counsel to represent Plaintiffs at the hearing, which took place on June 4, 2025.  (5/20/25 Order (Dkt. # 118); 6/4/25 Min. Entry (Dkt. # 131).)  On June 9, 2025, Magistrate Judge Peterson issued findings and a recommendation that the court hold Mr. Lysyy in contempt.  (F&R (Dkt. # 133).)

On June 9, 2025, the court held a pretrial conference regarding the June 23, 2025 bench trial on Plaintiffs' quiet title and § 362(k) claims.  (6/9/25 Min. Entry (Dkt. # 134).)  Trial briefs and proposed findings of fact and conclusions of law were due on June 16, 2025.  (*See* 5/27/25 Order (Dkt. # 123) (granting Defendants' motion to strike the jury trial and setting deadlines); *see also* 6/9/25 Pretrial Order (Dkt. # 132) (acknowledging the deadline).)  Plaintiffs, however, failed to file these documents.  (*See*

ORDER - 5

*generally* Dkt.)  As a result, the court ordered Plaintiffs to show cause why the court should not dismiss this matter as a sanction for violating the pretrial order.  (6/17/25 Order (Dkt. # 140).)  On June 20, 2025—just three days before trial was to commence— Mr. Pope responded to the order to show cause.  (OSC Resp. (Dkt. # 142).)  In his response, Mr. Pope set forth the "extraordinary circumstances" that, he asserted,

> rendered [him] unable to comply with the pretrial order.  These include[d] the recent discovery of Peter Kuzmenko's impersonation of Vasiliy Lysyy, the Lysyys' failure to attend a scheduled deposition on July 18, 2024, the Lysyys' failure to attend a judicial settlement conference on May 7, 2025, the late and disorganized provision by Defendants of critical pre-trial exhibits, and the paralyzing psychological distress and potential health risks to counsel.

(*Id.* at 1-2.)  With regard to the alleged impersonation, Mr. Pope represented that he had engaged in "very extensive discussion" with "an individual identifying himself as [Mr.] Lysyy" who, it turns out, was actually Mr. Kuzmenko.  (*Id.* at 2-3.)  Mr. Pope further asserted that he believed that Mr. Kuzmenko's influence on the Lysyys "likely played a role" in Plaintiffs' absence from the settlement conference and that Mr. Kuzmenko "appear[ed] intent on sabotaging" settlement discussions between the parties.  (*Id.* at 3-4.) The court then struck the bench trial that was set to begin on June 23, 2025; reserved ruling on the order to show cause regarding violation of the pretrial order; and scheduled a status conference to take place in lieu of the beginning of trial on June 23, 2025. (6/20/25 Order (Dkt. # 144).)  Plaintiffs filed objections to Magistrate Judge Peterson's findings and recommendation regarding contempt that same day.  (Contempt Obj. (Dkt. # 143).)

ORDER - 6

During the June 23, 2025 status conference, the court asked the Lysyys about Mr. Kuzmenko's involvement in this action. The Lysyys testified that they trusted Mr. Kuzmenko to talk with Mr. Pope about their case and that they did not believe Mr. Kuzmenko was impersonating Mr. Lysyy. In addition, Mr. Pope testified that although Defendants provided exhibits on June 2, 2025, the exhibits were confusing and disorganized. He acknowledged that he did not serve any discovery requests on Defendants and, as a result, he had never before seen many of the documents that Defendants intended to use as exhibits. Defendants provided Mr. Pope their final exhibits on June 16, 2025.

At the end of the June 23, 2025 conference, the court ordered the parties to make proffers of evidence at a hearing the next day regarding Plaintiffs' quiet title claim. (*See* 6/23/25 Min. Entry (Dkt. # 145); 6/23/25 Order (Dkt. # 146).) During the June 24, 2025 hearing, the parties discussed their proffers of evidence, moved orally for judgment as a matter of law on the quiet title claim, and agreed that the quiet title claim could be resolved through written briefing without a need for witness testimony. (*See* 6/24/25 Min. Entry (Dkt. # 148); 6/24/25 Order (Dkt. # 149) (setting a briefing schedule for the quiet title claim).)

On July 10, 2025, the court sustained Plaintiffs' objections to Magistrate Judge Peterson's findings and recommendation regarding contempt sanctions arising from the settlement conference Plaintiffs failed to attend. (7/10/25 Order (Dkt. # 155).)

On September 4, 2025, the court heard oral argument regarding the parties' motions for judgment as a matter of law. (*See* 9/4/25 Min. Entry (Dkt. # 159).) The

ORDER - 7

court informed the parties that it intended to grant Defendants' motion with a written order to follow. (*See id.*) The court and counsel agreed to begin the bench trial on Plaintiffs' § 362(k) claim on December 9, 2025. (*See* 9/5/25 Min. Order (Dkt. # 160).)

In October 2025, the court ordered the parties to file an amended proposed pretrial order, trial briefs, and proposed findings of fact and conclusions of law focusing on the § 362(k) claim. (*See* 10/28/25 Min. Order (Dkt. # 161).) The court also ordered the parties to file amended proposed findings of fact and conclusions of law after the trial that included citations to the exhibits and testimony introduced at trial. (*Id.* (directing the parties to file "[a]mended proposed findings of fact and conclusions of law containing citations to the admitted exhibits and trial transcript" no later than "10 days after trial transcripts are filed"); *see also* 12/10/25 Min. Entry (Dkt. # 169) (resetting the deadline for filing final amended proposed findings of fact and conclusions of law).)

On November 13, 2025, the court signed and entered the parties' amended agreed pretrial order. (*See* 11/13/25 Pretrial Order (Dkt. # 163).) The parties filed trial briefs and amended proposed findings of fact and conclusions of law focusing on the § 362(k) claim on November 21, 2025. (Pls. Tr. Br. (Dkt. # 166); Defs. Tr. Br. (Dkt. # 165); Pls. Am. FOFCOL (Dkt. # 167); Defs. Am. FOFCOL (Dkt. # 164).)

The court presided over the bench trial on December 9 and 10, 2025. (*See* 12/9/25 Min. Entry; 12/10/25 Min. Entry.) During trial, Defendants orally moved to dismiss Mr. Lysyy's § 362(k) claim. (*See* 12/10/25 Min. Entry.) The parties filed final proposed findings of fact and conclusions of law on January 5 and 6, 2026. (Defs. Final FOFCOL (Dkt. # 179); Pls. Final FOFCOL (Dkt. # 180).)

Below, the court first resolves the parties' motions for judgment as a matter of law on Plaintiffs' quiet title claim, then sets forth findings of fact and conclusions of law regarding Plaintiffs' § 362(k) claim, and finally, resolves several matters that are still outstanding in this case.

### III.   MOTIONS FOR JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' QUIET TITLE CLAIM

Before the court are the parties' motions for judgment as a matter of law on Plaintiffs' quiet title claim.  The parties made their motions orally at the June 24, 2025 hearing and supported them with briefing.  (*See* Pls. Quiet Title Br. (Dkt. # 147); Defs. Quiet Title Resp. (Dkt. # 151); Pls. Quiet Title Reply (Dkt. # 154).)  As discussed below, the court GRANTS Defendants' motion, DENIES Plaintiffs' motion, and DISMISSES Plaintiffs' quiet title claim.

**A.   Factual Background**

On November 9, 2006, Ms. Lysyy executed a promissory note (the "Note") that required her to make monthly installment payments on a $249,500 loan (the "Loan") beginning on January 1, 2007, and ending on the Loan's maturity date of December 1, 2036.  (Ad. Fact # 1; Ex. A-1.[5])  To secure the Note, Plaintiffs executed a Deed of Trust (the "DOT"), which encumbers the Property.  (Ad. Fact # 2; Ex. A-2.)

//

//

//

---

[5] The admitted facts and exhibit numbers in the quiet title section of this order are drawn from the June 9, 2025 agreed pretrial order.  (*See* 6/9/25 Pretrial Order.)

Ms. Lysyy has made no payments on the Loan and has been in default since April 1, 2010.  (Ex. 22, ¶ 10; Ad. Fact # 3.)  On September 15, 2010, Bank of America, which was then servicing the Loan, issued a notice of intent to accelerate the Loan that states:

> If the default is not cured on or before October 15, 2010, the mortgage payments **will be accelerated** with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings will be initiated at that time.  As such, the failure to cure the default may result in the foreclosure and sale of your property.

(Ex. 4 at 1 (emphasis in original).)  The parties agreed during the September 4, 2025 hearing that there are no notices of intent to accelerate in the record that predate or post-date the September 15, 2010 notice.  It is undisputed that Ms. Lysyy did not cure the default.  (*See* Ad. Fact # 3.)

Defendant SPS began servicing the Loan in 2016.  (Ex. 7.)  On November 15, 2017, SPS issued a monthly statement for the Loan that includes the following language:

> *This account has been accelerated*, which means all outstanding amounts are due.  The accelerated amount as of 11/15/2017 is $364,325.42.
> As of 11/15/2017, SPS will accept the amount below to reinstate this account:
> . . .
> Amount to reinstate account          $94,173.68.

(Ex. A-36 at 43-45 (emphasis added).)  The parties agreed during the September 4, 2025 hearing that the November 15, 2017 statement is the earliest document in the record that shows that the Loan had in fact been accelerated.

Ms. Lysyy filed for Chapter 13 bankruptcy three times after she defaulted on the Loan in 2010.  (Ad. Fact # 5.)  She filed her first petition on October 11, 2019.  (Ad. Fact # 8.)  This action was dismissed on January 3, 2020.  (*Id.*)  She filed her second petition

on July 8, 2021.  (Ad. Fact # 7.)  The second action was dismissed on August 31, 2021. (*Id.*)  She filed her third petition on October 19, 2023.  (Ad. Fact # 6.)  The third action was dismissed on January 12, 2024.  (*Id.*)  The foreclosure trustee, nominal Defendant Quality Loan Service ("Quality"), recorded twelve notices of trustee's sale ("NOTS") between 2015 and 2023.  (Ad. Facts ## 10.1-10.12; Exs. A-22, A-24-34.)

**B.      Standard of Review**

During the June 24, 2025 hearing, both parties moved for judgment as a matter of law on the quiet title claim.  Motions for judgment as a matter of law, however, do not apply to a bench trial.  *See generally* Fed. R. Civ. P. 50 (governing motions for judgment as a matter of law in a *jury* trial); *see also MacLean Townhomes, LLC v. Charter Oak Fire Ins. Co.*, No. C06-1093BHS, 2008 WL 4821004, at *1 (W.D. Wash. Nov. 3, 2008) (denying defendant's Rule 50 motion for judgment as a matter of law in a bench trial). Accordingly, the court informed the parties at the September 4, 2025 hearing that it would construe their motions for judgment as a matter of law as motions for summary judgment under Federal Rule of Civil Procedure 56.  Neither party objected.

Summary judgment is appropriate if the evidence viewed in the light most favorable to the non-moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To carry its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030-31 (9th Cir. 2015) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. "This burden is not a light one." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). A "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A).

The court must "view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party[.]" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and citation omitted). It may not weigh evidence or make credibility determinations. *Anderson*, 477 U.S. at 249-50. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380 (citation omitted).

//

//

ORDER - 12

## C.    Analysis

Plaintiffs assert that they are entitled to judgment as a matter of law on their quiet title claim because the statute of limitations has expired on claims arising from the Note and DOT and, as a result, Defendants are barred from bringing a foreclosure action against the Property.  (Pls. Quiet Title Br. at 7-12.)  Defendants contend that the claim must be dismissed because Plaintiffs cannot demonstrate that the statute of limitations has expired.  (*See* Defs. Quiet Title Resp. at 7-14.)

Under RCW 7.28.300, even a defaulted property owner may maintain a quiet title action "where an action to foreclose such mortgage or deed of trust would be barred by the statute of limitations[.]"  RCW 7.28.300.  A six-year statute of limitations applies to actions arising out of promissory notes and deeds of trust.  *See* RCW 4.16.040(1); *Cedar W. Owners Ass'n v. Nationstar Mortg., LLC*, 434 P.3d 554, 559 (Wash. Ct. App. 2019).  For an installment note like the one at issue here, "the statute of limitations runs against each installment from the time it becomes due[.]"  *4518 S. 256th, LLC v. Karen L. Gibbon, P.S.*, 382 P.3d 1, 6 (Wash. Ct. App. 2016) (internal quotation marks and citations omitted).  If the installment note is accelerated, however, "the entire remaining balance becomes due and the statute of limitations is triggered for all installments that had not previously become due."  *Id.* (citations omitted).  As discussed below, the court concludes as a matter of law that Plaintiffs' quiet title claim must be dismissed because the statute of limitations for claims arising from the Note and DOT has not yet expired.

//

//

ORDER - 13

1.      Trust # 1 and Trust # 2

The court begins by addressing the parties' dispute about Quality's use of two different but nearly identical beneficiary names on the notices of trustee's sale.  The Lysyys' DOT granted a security interest in the Property to former Defendant Mortgage Electronic Registration Systems, Inc. ("MERS").  (*See* Ex. A-2.)  On September 14, 2011, MERS assigned the DOT to "Deutsche Bank National Trust Company, as Trustee *under the Pooling and Servicing Agreement relating to* IMPAC Secured Assets Corp., Mortgage Pass-Through Certificates, Series 2007-1[.]"  (Ex. A-3 (emphasis added).)  Plaintiffs refer to this entity as "Trust # 1."  (*See generally* Pls. Quiet Title Br.)  Trust # 1 recorded its appointment of Quality as trustee on July 31, 2015.  (Ex. 9.)

Between September 2015 and June 2023, Quality recorded 12 notices of trustee's sale.  (*See* Ad. Fact # 10 (listing notices).)  The first four named Trust # 1 as beneficiary of the DOT.  (*See* Exs. A-24-27.)  The rest, however, named the Defendant Trust—that is, "Deutsche Bank National Trust Company, as trustee, *on behalf of the holders of the Impac Secured Assets Corp. Mortgage Pass-Through Certificates Series 2007-1*"—as beneficiary.  (*See* Exs. A-22, A-28-34 (emphasis added).)

The parties dispute the significance of Quality's use of two different names for the beneficiary on the notices of trustee's sale.  First, Plaintiffs assert that the Defendant Trust, which they call "Trust # 2," is a separate entity from Trust # 1.  As a result, according to Plaintiffs, the Defendant Trust lacks standing to foreclose because Trust # 1 is the actual beneficiary of the DOT.  (*See, e.g.*, Pls. Quiet Title Br. at 3-5.)  Defendants counter that the Defendant Trust is the beneficiary and has standing because it is the

ORDER - 14

holder of the Note. (Defs. Quiet Title Resp. at 7.) The court concludes that it need not resolve this question because the quiet title claim is based on the expiration of the statute of limitations for an action to foreclose on the Note and DOT. *See* RCW 7.28.300. Thus, even if Trust # 1 and Trust # 2 are separate entities, as Plaintiffs insist, neither can foreclose on the Property if the six-year statute of limitations on the Note and DOT has expired.

Second, Plaintiffs argue that a District of Nevada case has a preclusive effect on the Defendant Trust's standing to foreclose. (*See* Pls. Quiet Title Br. at 5 (citing Ex. 10).) The court need not resolve this question, either. The Defendant Trust's standing to foreclose is not at issue here because, again, the quiet title claim is based on the running of the statute of limitations and there is no action for judicial or nonjudicial foreclosure currently pending. Furthermore, as Plaintiffs acknowledge, "[i]f the recorded beneficiary (Trust # 1) executes an assignment of the Deed of Trust to the actual note holder (Trust # 2), then Trust # 2 could legally foreclose[,]" thus curing any potential standing issue. (Pls. Quiet Title Reply at 3.)

Third, Plaintiffs ask the court to declare that the Defendant Trust waived its right to foreclose against the Property in the future by failing to raise a compulsory counterclaim for judicial foreclosure in this action. (*See* Pls. Quiet Title Br. at 6-7.) The court denies this request because Plaintiffs did not raise this claim in the pretrial order. (*See generally* 6/9/25 Pretrial Order (discussing only claims for quiet title and violation of the bankruptcy stay).) "A pretrial order generally supersedes the pleadings, and the parties are bound by its contents." *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950

(9th Cir. 1993) (citation omitted, cleaned up).  "[I]ssues not preserved in the pretrial order have been eliminated from the action." *S. California Retail Clerks Union & Food Emp'rs Joint Pension Tr. Fund v. Bjorklund*, 728 F.2d 1262, 1264 (9th Cir. 1984) (citation omitted); *see also* Fed. R. Civ. P 16(d) (providing that the pretrial order "controls the course of the action unless the court modifies it").  Because Plaintiffs did not include a claim for a declaratory judgment that the Defendant Trust waived its right to foreclose in the pretrial order, Plaintiffs cannot pursue that claim now.

Having concluded that it need not resolve the parties' dispute regarding the beneficiary names used in the notices of trustee's sale, the court proceeds to consider the merits of Plaintiffs' quiet title claim.

2.    Defendants Need Not Have a Current Title Interest in the Property

Plaintiffs assert that they prevail on their quiet title claim based on Defendants' representation that none of them currently have a title interest in the Property.  (Pls. Quiet Title Br. at 1 (citing Defs. 1st Trial Br. (Dkt. # 138) at 10, 11).) [6]  Plaintiffs are wrong. Defendants made their representation when arguing in their trial brief that Plaintiffs cannot prevail on a quiet title claim under RCW 7.28.120, which requires a determination of which party has superior title in the property at issue.  (*See* Defs. 1st Trial Br. at 10.) That statute provides:

> The plaintiff in [a quiet title] action shall set forth in his or her complaint the nature of his or her estate, claim or title to the property, and the defendant may set up a legal or equitable defense to plaintiff's claims; and the superior title, whether legal or equitable, shall prevail.

[6] Defendants clarify that although they do not have a current title interest in the Property, they do have a lien interest based on the Note and DOT.  (*See* Defs. Quiet Title Resp. at 4.)

ORDER - 16

RCW 7.28.120.  Plaintiffs, however, brought their quiet title claim under RCW 7.28.300, which is based on the running of the statute of limitations and does not require a defendant to have a title interest in the property at issue.  *See* RCW 7.28.300.  Therefore, Defendants' representation that they do not have a title interest in the Property does not, on its own, entitle Plaintiffs to summary judgment on their RCW 7.28.300 claim.

> 3.      The Loan Was Accelerated Effective November 15, 2017

Plaintiffs assert that the Loan was accelerated effective October 15, 2010.  (*See* Pls. Quiet Title Br. at 7.)  Defendants counter that the earliest acceleration date supported by the evidence is November 15, 2017.  (*See* Defs. Quiet Title Resp. at 9-12.)  The court agrees with Defendants.

The Note was an installment note payable in monthly installments with a maturity date of December 1, 2036.  (Ex. A-1.)  As a result, absent acceleration, the final six-year period to initiate a foreclosure action normally would not begin to run until the Note's maturity date on December 1, 2036.  *Merritt v. USAA Fed. Sav. Bank*, 532 P.3d 1024, 1031 (Wash. 2023).  Acceleration of an installment note must be made "in a clear and unequivocal manner which effectively apprises the maker that the holder has exercised his right to accelerate the payment date."  *Merceri v. Bank of New York Mellon*, 434 P.3d 84, 88 (Wash. Ct. App. 2018) (quoting *Glassmaker v. Ricard*, 593 P.2d 179, 181 (Wash. Ct. App. 1979)) (cleaned up).

Here, SPS's November 15, 2017 monthly loan statement includes the language, "This account has been accelerated, which means all outstanding amounts are due."

ORDER - 17

(Ex. A-36 at 43-45.)  It is undisputed that this document is the earliest document in the record that expressly states that the Loan had in fact been accelerated.

Plaintiffs nevertheless insist that the Loan was accelerated on October 15, 2010, 30 days after Bank of America issued its September 15, 2010 notice of intent to accelerate.  (*See* Pls. Quiet Title Br. at 7-10; Pls. Quiet Title Reply at 6-7.)  They assert that the language of that notice indicates that the Loan was accelerated automatically when Ms. Lysyy failed to timely cure the default.  (*See* Pls. Quiet Title Br. at 7-10; Ex. 4).)  In *Merceri v. Bank of New York Mellon*, however, the Washington Court of Appeals concluded that a notice of intent to accelerate that included the *exact same language* as Bank of America's September 15, 2010 notice was insufficient to show that the bank took "an affirmative action in a clear and unequivocal manner indicating that the payments on the loan had been accelerated."  *Merceri*, 434 P.3d at 88; *see also Terhune v. N. Cascade Tr. Servs., Inc.*, 446 P.3d 683, 689 (Wash. Ct. App. 2019) (holding that the language "will be accelerated" was "a statement only of an *intent* to accelerate at some time in the future") (emphasis in original).  Because the undisputed first "clear and unequivocal" evidence of actual acceleration in the record is the November 15, 2017 statement, the court concludes, as a matter of law, that the acceleration date for the Loan is November 15, 2017.

3.  The Notices of Trustee's Sale and Ms. Lysyy's Bankruptcy Cases Tolled the Statute of Limitations

Having determined the acceleration date, the court must next consider whether Plaintiffs can show that the six-year statute of limitations for initiating a foreclosure

action has expired.  Absent tolling, the statute of limitations on the Note and DOT would have expired on November 15, 2023, six years after the November 15, 2017 acceleration date.  Defendants, however, assert that the statute of limitations was tolled under RCW 4.16.230, which provides:

> When the commencement of an action is stayed by injunction or a statutory prohibition, the time of the continuance of the injunction or prohibition shall not be a part of the time limited for the commencement of the action.

RCW 4.16.230; (*see* Defs. Quiet Title Br. at 10).  Defendants argue that Ms. Lysyy's bankruptcy proceedings, Quality's notices of trustee's sale, and the parties' FFA mediations functioned as stays that tolled the statute of limitations.  (*Id.* at 10-11.)  The court agrees that Ms. Lysyy's bankruptcies and the notices of trustee's sale tolled the statute of limitations but denies Defendants' untimely request to consider time spent in FFA mediation when calculating the amount of time the statute of limitations was tolled.

First, Ms. Lysyy's bankruptcy proceedings tolled the statute of limitations because 11 U.S.C. § 362(a) automatically stays all proceedings against a debtor, including the commencement of a foreclosure action.  *Loun v. U.S. Bank Nat'l Ass'n*, 525 P.3d 1280, 1285 (Wash. Ct. App. 2023).

Second, the weight of Washington authority holds that nonjudicial foreclosure attempts toll the statute of limitations, beginning from the date the notice of trustee's sale was recorded until either the date scheduled for the foreclosure sale or 120 days after the last date on which the sale could have been continued.  *Cedar W. Owners Ass'n*, 434 P.3d at 562; *see* <u>Merceri</u>, 434 P.3d at 87 n.1 (rejecting plaintiff's argument that a nonjudicial

foreclosure attempt did not toll the statute of limitations); RCW 61.24.040 (stating the trustee "may, for any cause the trustee deems advantageous, continue the sale for a period or periods not exceeding a total of 120 days").

Plaintiffs cite a footnote in *Loun v. U.S. Bank Nat'l Ass'n* for the proposition that a nonjudicial foreclosure does not toll the statute of limitations.  (*See* Pls. Quiet Title Br. at 11 (citing *Loun*, 525 P.3d at 241 n.4).)  The court, however, has found no case law adopting the *Loun* court's position regarding nonjudicial foreclosures, nor have Plaintiffs cited any.  (*See generally* Pls. Quiet Title Br.; Pls. Quiet Title Reply.)  Plaintiffs also argue that the statute of limitations should not be tolled by notices of trustee's sale that name Trust # 2 as the beneficiary.  (*See* Pls. Quiet Title Br. at 11.)  Again, however, Plaintiffs do not cite any authority supporting this proposition, and the court has not found any in its own research.  (*See generally id.*)  Therefore, the court adopts the majority view that the notices of trustee's sale tolled the statute of limitations.

Third, Defendants may not invoke the FFA mediations as a tolling event because they did not raise this issue in the pretrial order or any earlier filing.  (*See* 6/9/25 Pretrial Order at 4, 6 (listing only the notices of trustee's sale and bankruptcies as tolling events)); *see also Patterson*, 11 F.3d at 950; *S. California Retail Clerks Union*, 728 F.2d at 1264; Fed. R. Civ. P 16(d).  Defendants asserted at oral argument that the court should allow them to rely on the FFA mediations because Plaintiffs were aware that they had attended the mediations.  The mere fact that Plaintiffs attended the mediations, however, is not enough to put Plaintiffs on notice that Defendants would rely on those mediations as part of their defense to the quiet title claim.  Therefore, the court considers only the

ORDER - 20

bankruptcies and notices of trustee's sale in determining the amount of time the statute of limitations has been tolled.

4.    The Statute of Limitations is Tolled Through at Least March 12, 2027.

Counting only Ms. Lysyy's bankruptcy cases and the notices of trustee's sale that were recorded after the November 15, 2017 acceleration date, the court estimates that the statute of limitations has been tolled for 1,213 days, as follows:

| Tolling Event | Start | End | Tolling Period |
|---|---|---|---|
| Oct. 17, 2017 NOTS, setting Feb. 16, 2018 sale (Ex. A-28) | Nov. 15, 2017 (acceleration date) | Feb. 16, 2018 | 93 days |
| July 24, 2018 NOTS, setting Nov. 30, 2018 sale (Ex. A-29[7]) | July 24, 2018 | Nov. 30, 2018 | 129 days |
| May 8, 2019 NOTS, setting Sept. 13, 2019 sale (Ex. A-30) | May 8, 2019 | Sept. 13, 2019 | 128 days |
| October 11, 2019 Bankruptcy Filing (Ad. Fact #8) | Oct. 11, 2019 | Jan. 3, 2020 (Ad. Fact # 8) | 84 days |
| Feb. 21, 2020 NOTS, setting Mar. 27, 2020 sale (Ex. A-31) | Feb. 21, 2020 | June 20, 2020[8] | 120 days |
| Dec. 15, 2020 NOTS, setting Apr. 30, 2021 sale (Ex. A-32) | Dec. 15, 2020 | Apr. 30, 2021 | 136 days |
| July 8, 2021 Bankruptcy Filing (Ad. Fact # 7) | July 8, 2021 | Aug. 31, 2021 (Ad. Fact # 7)[9] | 54 days |

---

[7] In their briefing, Defendants erroneously stated that the sale date set in this notice of trustee's sale was November 13, 2018. (*See* Defs. Quiet Title Resp. at 11.)

[8] Defendants claim that 120 days of tolling applies where the number of days between the date the notice of trustee's sale was recorded and the date scheduled for the foreclosure sale is less than 120 days. (*See* Defs. Quiet Title Resp. at 10-12 (citing *Cedar W. Owners Ass'n*, 434 P.3d at 562).) Plaintiffs did not oppose Defendants' claim. (*See generally* Pls. Quiet Title Reply.)

[9] In their briefing, Defendants erroneously based this tolling period on the bankruptcy action's termination date rather than its dismissal date. (*See* Defs. Quiet Title Resp. at 12

ORDER - 21

| Tolling Event | Start | End | Tolling Period |
|---|---|---|---|
| Sept. 10, 2021 NOTS, setting Oct. 29, 2021 sale (Ex. A-33) | Sept. 10, 2021 | Jan. 8, 2022[10] | 120 days |
| Jan. 6, 2023 NOTS, setting May 19, 2023 sale (Ex. A-34) | Jan. 6, 2023 | May 19, 2023 | 133 days |
| June 9, 2023 NOTS, setting Oct. 20, 2023 sale (Ex. A-22) | June 9, 2023 | Oct. 20, 2023 | 133 days |
| Oct. 19, 2023 Bankruptcy Filing (Ad. Fact. # 6) | Oct. 21, 2023 (to avoid overlap with the above) | Jan. 12, 2024 (Ad. Fact # 6.) | 83 days |
| **TOTAL DAYS OF TOLLING** | | | **1,213 days** |

As a result, the statute of limitations on foreclosure actions against the Property will not expire until March 12, 2027 (1,213 days after November 15, 2023) and Plaintiffs cannot, as a matter of law, demonstrate that they are entitled at this time to quiet title under RCW 7.28.300.[11]  Therefore, the court grants Defendants' motion for summary judgment on Plaintiffs' quiet title claim and dismisses that claim without prejudice against raising the claim in the future if Defendants do not move forward with foreclosure before the statute of limitations expires.

---

(asserting the July 8, 2021 bankruptcy case was dismissed on February 7, 2022).)  As the parties state in their agreed admitted facts, however, Ms. Lysyy's petition was actually dismissed on August 31, 2021.  (Ad. Fact # 7.)

[10] *See supra*, n.8.

[11] The court does not consider Defendants' secondary argument that the statute of limitations was tolled because Ms. Lysyy "acknowledged the debt" by submitting loan modification applications.  (*See* Defs. Quiet Title Resp. at 13-14.)  Defendants did not include this defense in the pretrial order; instead, they raised it for the first time in their briefing on the quiet title claim.

ORDER - 22

## D.     Attorneys' Fees

The Trust seeks an award of reasonable attorneys' fees and costs pursuant to Paragraphs 9 and 26 of the DOT.  (Defs. Quiet Title Resp. at 14 (citing Ex. A-2 ¶¶ 9, 26).)  The court defers ruling on this request.  The Trust may file a motion for an award of attorneys' fees and costs no later than 21 days after entry of this order.  The court places the Trust on notice that it will be paying careful attention to segregation of fees incurred in relation to claims for which fees are authorized by the DOT when it evaluates the Trust's motion for an award of attorneys' fees.

**IV.     BENCH TRIAL ON PLAINTIFFS' VIOLATION
OF BANKRUPTCY STAY CLAIM**

On December 9 and 10, 2025, the court presided over a bench trial on Plaintiffs' 11 U.S.C. § 362(k) claim for violation of the automatic bankruptcy stay.  (*See* 12/9/25 Min. Entry; 12/10/25 Min. Entry.)  During trial, Defendants orally moved to dismiss Mr. Lysyy's § 362(k) claim.  (*See* 12/10/25 Min. Entry.)  The parties filed briefs regarding the motion to dismiss on December 12, 2025.  (Defs. § 362(k) Br. (Dkt. # 174); Pls. § 362(k) Br. (Dkt. # 175).)  The parties filed their final proposed findings of fact and conclusions of law on January 5 and 6, 2026.  (Defs. Final FOFCOL; Pls. Final FOFCOL.[12])

Below, the court first considers the threshold question of Mr. Lysyy's standing to pursue a § 362(k) claim, then sets forth its credibility findings, its findings of fact, and its conclusions of law.

---

[12] Although Plaintiffs timely filed their final proposed findings of fact and conclusions of law, they only sporadically cite exhibits or refer the court to specific testimony, making the court's review of their proposed findings challenging.  (*See generally* Pls. Final FOFCOL.)

ORDER - 23

**A.      Mr. Lysyy Lacks Standing to Pursue a § 362(k) Claim**

On the second day of trial, Defendants moved for judgment on partial findings regarding Mr. Lysyy's standing to pursue a § 362(k) claim.  (*See* 12/10/25 Min. Entry.)  The court ordered briefing on the issue.  (*See id.*; *see* Pls. § 362(k) Br.; Defs. § 362(k) Br.)  For the reasons set forth below, the court concludes that Mr. Lysyy lacks standing to bring a § 362(k) claim and therefore grants Defendants' motion.

Third-party non-debtor co-owners of property at issue in a bankruptcy action lack standing to assert a § 362(k) claim.  *See In re Globe Inv. & Loan Co.*, 867 F.2d 556, 559-60 (9th Cir. 1989) (holding that co-owners of property did not have standing to pursue a claim for violation of the automatic stay); *see also Tilley v. Vucurevich (In re Pecan Groves of Ariz.)*, 951 F.2d 242, 245 (9th Cir. 1991) (holding that the debtor and trustee are the only legal beneficiaries of the automatic stay); *In re Brooks*, 79 B.R. 479, 481 (B.A.P. 9th Cir. 1987) ("[I]f the debtor or the trustee chooses not to invoke the protections of § 362, no other party may attack any acts in violation of the automatic stay.").  Courts in the Ninth Circuit and beyond have likewise held that non-debtor co-owners of property at issue in a bankruptcy action lack standing to assert a violation of the automatic stay under § 362(k).  *See, e.g.*, *In re Ng*, No. 10-61392 RLE, 2011 WL 6133183, at *6 (Bankr. N.D. Cal. Dec. 8, 2011) (holding that co-owner of property lacked standing to pursue a § 362(k) claim); *Yanik v. Countrywide Home Loans, Inc.*, No. CV 10-6268 CAS, 2011 WL 223739, *3 (C.D. Cal. Jan. 21, 2011) (same, and compiling cases so holding); *see also In re Siskin*, 231 B.R. 514, 518-19 (Bankr. E.D.N.Y. 1999) (holding that non-debtor spouse lacked standing to bring a claim for violation of the

automatic stay); *In re Rushing*, 443 B.R. 85, 100 (Bankr. E.D. Tex. 2010) (same). Accordingly, because Mr. Lysyy is not a named debtor on Ms. Lysyy's October 11, 2019 bankruptcy petition, he does not have standing to pursue a § 362(k) claim. (*See generally* Ex. 12.[13]); *see also In re Dawson*, 390 F.3d 1139, 1150 (9th Cir. 2004) (noting that although debtor's wife submitted a declaration describing her emotional distress, "she was not a debtor whose damages could be compensable").

Plaintiffs assert that Washington's community property laws and principles of prudential standing should lead to the opposite conclusion. (Pls. § 362(k) Br. at 4-6.) They cite no in-circuit cases, however, that hold that a non-debtor spouse or co-owner has standing to raise a § 362(k) claim or to be awarded damages on such a claim. (*See generally id.* (citing cases).) In *In re Sundquist*, for example, both spouses filed the bankruptcy petition. *See Sundquist v. Bank of Am., N.A.*, 566 B.R. 563, 574 (Bankr. E.D. Cal. 2017) (stating that "the Sundquists" filed the bankruptcy cases), *vacated in part sub nom. In re Sundquist*, 580 B.R. 536 (Bankr. E.D. Cal. 2018). Similarly, in *In re Demas Wai Yan*, the Ninth Circuit Bankruptcy Appellate Panel held that a creditor did not have standing to recover damages under § 362(k). *In re Demas Wai Yan*, No. ADV NC-08-03166, 2015 WL 845570, at *4 (B.A.P. 9th Cir. Feb. 26, 2015), *aff'd*, 703 F. App'x 582 (9th Cir. 2017). The court has reviewed Plaintiffs' remaining cited cases and finds none of them persuasive.

---

[13] The admitted facts and exhibit numbers in this section of this order are drawn from the November 13, 2025 agreed pretrial order. (*See* 11/13/25 Pretrial Order.)

For these reasons, the court concludes that only Ms. Lysyy may pursue a § 362(k) claim because she was the sole debtor named in the October 11, 2019 bankruptcy petition. (*See* Ex. 12.) As a result, the court dismisses Mr. Lysyy's § 362(k) claim with prejudice for lack of statutory standing.

**B.    Credibility Determinations**

The court makes the following findings regarding the credibility of the parties' witnesses.

1.    Plaintiff Tatyana Lysyy is a co-owner of the Property and the debtor in the bankruptcy action at issue in her § 362(k) claim. She testified regarding her experience with the Property, her bankruptcy filing, and the emotional distress she suffered during the relevant time frame. She has a strong interest in the outcome of this action and her memory of the facts supporting her claim is poor. For these reasons, the court finds that Ms. Lysyy's testimony reflects bias in her own favor and considers that bias when evaluating her testimony.

2.    Vasiliy Lysyy is Ms. Lysyy's husband and a co-owner of the Property. He testified regarding his experience with the Property, Ms. Lysyy's bankruptcy filing, and the emotional distress he suffered during the relevant time frame. As Ms. Lysyy's husband, he has a strong interest in the outcome of this action. The court finds Mr. Lysyy's testimony lacks credibility due to events in the courtroom during the bench trial. During Ms. Lysyy's testimony, the court instructed witnesses not to take their cell phones to the witness box and admonished Mr. Kuzmenko, who was present in the courtroom, to refrain from expressing agreement or disagreement with witnesses during their

testimony. (T. Lysyy at 63-64.) During Mr. Lysyy's testimony, the court noticed that Mr. Lysyy had his cell phone with him and suspected that Mr. Lysyy might be using his phone to receive assistance from Mr. Kuzmenko. The court asked Mr. Lysyy directly if he had his cell phone with him. (V. Lysyy at 89.) Mr. Lysyy responded that he had his cell phone but had kept it in his pocket. (V. Lysyy at 89.) After the court expressed its concern that Mr. Lysyy might be receiving messages on his phone while testifying, Mr, Lysyy denied hearing that he was not allowed to bring his phone to the witness stand and denied receiving any messages. (V. Lysyy at 89.) The court instructed Mr. Lysyy to give his phone to the courtroom deputy clerk during his testimony. (V. Lysyy at 90.) At that time, the court observed that the phone was on the floor rather than in Mr. Lysyy's pocket. (V. Lysyy at 90.) Based on this conduct and Mr. Lysyy's strong interest in the outcome of this action, the court gives little weight or credence to Mr. Lysyy's testimony.

3.      Patrick Pittman is a 23-year SPS employee who has served as its litigation director for ten years. He appeared at the bench trial as the party representative for SPS and the Trust and testified about SPS's handling of the trustee's sale of the Property, SPS's notice of and conduct subsequent to learning about Ms. Lysyy's bankruptcy petition, and Safeguard's entry onto the Property. As a representative of Defendants SPS and the Trust, Mr. Pittman has a strong interest in this case, but his testimony was consistent with the declaration he submitted in this case in February 2024 and the documents admitted into evidence. The court finds that Mr. Pittman's testimony was credible but considers his potential bias in favor of his employer when evaluating that testimony.

4.      Steve Meyer is a 28-year Safeguard employee and assistant vice president of Safeguard.  He is responsible for managing Safeguard's code compliance, environmental, property preservation, and insurance service teams.  He appeared as party representative for Safeguard and testified about Safeguard and its local contractor's conduct relating to the Property in October 2019.  The court finds that Mr. Meyer, as representative for Safeguard, has a strong interest in this case.  The court finds that Mr. Meyer's testimony was credible but considers his potential bias in favor of his employer when evaluating that testimony.

5.      Christopher Barack is the Code Compliance Manager for the City of Auburn (the "City"), where the Property is located.  Mr. Barack testified about the City's vacant property registration program, its inspection of the Property, and its placement of a "No Trespassing" sign on the Property.  The court finds that Mr. Barack and the City of Auburn have no vested interest in the outcome of this action and finds Mr. Barack's testimony credible.

6.      Aleksandr Kanonik is an independent residential real estate appraiser who inspected and appraised the Property on February 5, 2022, at Mr. Kuzmenko's request.  The court finds that Mr. Kanonik has no vested interest in the outcome of this action and finds his testimony credible.

**C.      Findings of Fact**

1.      Plaintiffs Tatyana Lysyy and Vasiliy Lysyy are husband and wife.  They are the joint record owners of SE 318th Way, Auburn, Washington (the "Property"), which they purchased in fall 2004.  (T. Lysyy at 9-10.)

2.    On November 9, 2006, Ms. Lysyy executed a promissory note in the amount of $249,500 in favor of PMC Bancorp (the "Note").  (Ad. Fact # 1; Ex. A-1.)

3.    To secure repayment of the Note, Mr. Lysyy and Ms. Lysyy executed a deed of trust ("DOT"), which encumbers the Property.  (Ad. Fact # 2; Ex. A-2.)

4.    Defendant SPS is the loan servicer for Ms. Lysyy's loan (the "Loan") and the attorney-in-fact for the Defendant Trust.  (Ex. 22 ¶ 1.)

5.    The Loan has been in default since 2010.  (Ad. Fact # 3.)  In 2010, the Lysyys gave power of attorney authorization to Peter Kuzmenko so that he could act on the Lysyys' behalf.  (T. Lysyy at 65.)

6.    Mr. Kuzmenko is the Lysyys' friend and advisor.  He, like the Lysyys, is from Ukraine.  (T. Lysyy at 16.)  According to the Lysyys, Mr. Kuzmenko helps people in their community with legal issues.  (T. Lysyy at 16.)  Mr. Kuzmenko is also a real estate agent and was the mortgage broker for Ms. Lysyy's Loan.  (V. Lysyy at 74-75, 102.)

7.    Although Mr. Kuzmenko was deeply involved in the circumstances at issue in this case and was originally listed as a witness for Plaintiffs, Plaintiffs did not call him to testify at trial.  (11/13/25 Pretrial Order at 6 (stating Mr. Kuzmenko was "[e]xpected to testify regarding claims and defenses, the property, loan servicing, communications with the Lysyys, SPS, or the City of Auburn, and related documents"); 9/9/25 Tr. at 7.)

8.    In approximately 2012 or 2013, Plaintiffs moved away from the Property to a home in Fife, Washington.  (Ad. Fact # 4; T. Lysyy at 9-10, 14; V. Lysyy at 82.)  No one has lived at the Property since the Lysyys moved out.  (T. Lysyy at 14, 25, 27; V.

ORDER - 29

Lysyy at 82-83.)  After the Lysyys moved away, the Property was abandoned and was no longer being maintained.  (T. Lysyy at 25-27; V. Lysyy at 82-83.)  The Lysyys never tried to sell the Property.  (T. Lysyy at 15.)

9.      The Lysyys occasionally drove by the Property after they moved to Fife, but they did not enter the residence at the Property.  (T. Lysyy at 25, 37; V. Lysyy at 82-83.)  Ms. Lysyy would check with Mr. Kuzmenko to find out how things were going at the Property.  (T. Lysyy at 25.)

10.      After they moved away from the Property, the Lysyys had Mr. Kuzmenko handle issues with the Property and manage communications about the Property on their behalf.  (T. Lysyy at 21, 34; *see also id.* at 11 (stating that Mr. Kuzmenko helped the Lysyys with a loan modification request).)  When the Lysyys received letters regarding the Property, they redirected them to Mr. Kuzmenko for advice about what to do.  (T. Lysyy at 26, 72; V. Lysyy at 78.)

11.      With Mr. Kuzmenko's assistance, the Lysyys have made multiple unsuccessful requests for modifications of the Loan since 2012.  (T. Lysyy at 12, 14; V. Lysyy at 75, 104.)

12.      On July 10, 2019, Michael Marquardt inspected the Property at Mr. Kuzmenko's request. (Ex. A-14.)  Based on his inspection, Mr. Marquardt concluded that the Property was vacant and in poor condition.  (Ex. A-14.)

13.      Quality, as foreclosure trustee, scheduled a trustee's sale of the Property at 10:00 a.m. on Friday, October 11, 2019, pursuant to Washington's nonjudicial foreclosure process.  (Ex. 22 ¶ 12; Pittman at 136.)

ORDER - 30

14.    At some time before the trustee's sale, Mr. Kuzmenko advised Ms. Lysyy to file for bankruptcy.  (T. Lysyy at 22-23.)  On October 11, 2019, at 9:10 a.m., Ms. Lysyy, accompanied by her husband and Mr. Kuzmenko, filed a Chapter 13 bankruptcy petition in the U.S. Bankruptcy Court for the Western District of Washington.  (Ex. 12; Ad. Fact # 8; V. Lysyy at 80); *see In re Tatyana Lysyy*, No. 19-13736-TWD (Bankr. W.D. Wash.).  Ms. Lysyy named SPS as a creditor in her petition.  (Ex. 12 at 9.)  Mr. Lysyy was not a named debtor in the bankruptcy action.  (Ex. 12; Ex. A-16 at 2.)

15.    Neither Quality nor SPS received notice of Ms. Lysyy's bankruptcy filing before the trustee's sale was called.  Therefore, the sale went forward, and the Trust purchased the Property via a credit bid.  (Ex. 22 ¶ 12.)

16.    On October 11, 2019, at approximately 10:21 a.m., SPS referred the property to its Real Estate Owned ("REO") Department for further handling.  (Ex. A-4 at 698; Ex. 22 ¶ 12; Pittman at 185.)

17.    On October 11, 2019, at 11:27 a.m., Mr. Kuzmenko faxed notice to Quality that Ms. Lysyy had filed a Chapter 13 bankruptcy petition.  (Ex. A-16; V. Lysyy at 81-82.)  The fax included the Notice of Bankruptcy Filing issued by the bankruptcy court.  (Ex. A-16 at 2.)  That notice stated that the petition was filed at 9:10 a.m. on October 11, 2019.  (*Id.*)

18.    On Saturday, October 12, 2019, at 1:56 a.m., the Bankruptcy Notification Center emailed notice of Ms. Lysyy's bankruptcy filing to Jennifer Chacon, an SPS employee who worked in SPS's HR Training Department and had no responsibilities for handling bankruptcy notices.  (Ex. 22 ¶ 13; Ex. 25; Pittman at 141, 144-46.)  As a result,

ORDER - 31

SPS's Bankruptcy Department did not receive the notice that was sent to Ms. Chacon on October 12, 2019.  (Ex. 22 ¶ 13; Pittman at 148-49.)  None of the witnesses were able to explain how Ms. Chacon's email address became associated with SPS in the Bankruptcy Notification Center's system.

19.     SPS was closed for the weekend on Saturday, October 12, 2019, and Sunday, October 13, 2019.  (Pittman at 141-42.)  It was again open for business on Monday, October 14, 2019.  (Pittman at 142.)

20.     On the morning of October 14, 2019, Quality submitted notice to SPS's Foreclosure Department that Ms. Lysyy had filed for Chapter 13 bankruptcy.  (Ex. 22 ¶ 14; Pittman at 149-50.)  Quality provided this notice, however, "through the wrong bankruptcy process[.]"  (Ex. 22 ¶ 14; Pittman at 158, 165-66, 191-92.)  The notification was "placed under the correct task" on October 15, 2019.  (Pittman 158-59, 169.)  According to Mr. Pittman, Quality's notice did not include the time Ms. Lysyy filed her petition.  (Ex. 22 ¶ 15.)

21.     At 12:50 p.m. on October 14, 2019, Becky Baker of SPS's local counsel, McCarthy Holthus, LLP ("McCarthy Holthus"), entered a note in SPS's electronic file for Ms. Lysyy's mortgage.  (Ex. A-8 at 18; Ex. A-4 at 695; *see* Pittman at 160-61 (explaining that SPS used a system called "BKFS" for mortgage servicing).)  The note stated, "Pleas[e] re-open Foreclosure Rail.  *Sale is being unwound as Bankruptcy filed prior to sale and we were not notified*."  (Ex. A-8 at 18 (emphasis added); Ex. A-4 at 695-96 (same); Pittman at 177.)  According to Mr. Pittman, this notice also was not submitted through the proper task in SPS's electronic file.  (Pittman at 194-96.)

ORDER - 32

22.     At 1:05 p.m. on October 14, 2019, a note was entered in the electronic file to start the "Post sale BK [bankruptcy] filed process," which assigned the case to McCarthy Holthus to research the details of Ms. Lysyy's bankruptcy filing and to determine what effect, if any, the filing had on the trustee's sale. (Ex. A-4 at 694-95; Ex. 22 ¶ 15; Pittman at 155, 166-67, 188.)

23.     Based on the foregoing facts, the court finds that SPS had notice, by no later than mid-day on October 14, 2019, that Ms. Lysyy had filed a bankruptcy petition before the trustee's sale was completed on October 11, 2019.  SPS did not, however, take the Property out of REO status or otherwise cease its post-sale activities upon learning about Ms. Lysyy's filing.  Instead, as described below, SPS proceeded as if no bankruptcy petition had been filed.

24.     On October 15, 2019, SPS sent an automatic order to its REO vendor, Defendant RRR. (Pittman at 169.)  RRR then automatically submitted a request to Defendant Safeguard to inspect the Property to determine whether it was occupied or vacant. (Pittman at 169; Ex. 22 ¶ 16.)  Safeguard provides inspection and preservation services to mortgage servicers. (Meyer at 206-07.)  It uses local independent subcontractors to provide these services. (Meyer at 207.)

25.     Mr. Pittman testified that Section 9 of the Lysyys' deed of trust states that the mortgage servicer has "every right to protect the collateral of the property" if the Property is abandoned. (Pittman at 179-80, 199.)  This section states:

> **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal

ORDER - 33

proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

(Ex. A-2 at 8.)

26.     Section 9 further provides:

Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.   Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.

(Ex. A-2 at 8.)

27.     On October 16, 2019, SPS initiated eviction proceedings against the Lysyys.  (Ex. 1.)

28.     On October 17, 2019, Safeguard's local contractor confirmed that the Property was vacant and observed that the front door of the residence was open.  (Ex. 22 ¶ 16; Ex. A-9; Ex. A-10 at 1.)  The local contractor replaced the front-door deadbolt with a knob lock, installed five padlocks on other doors, installed a lockbox on the front door knob, completed a dry winterization of the Property, and performed landscape services such as trimming the grass and bushes.  (Ex. A-9; Ex. A-10; Ex. 22 ¶ 16; Meyer at 209-11.)

ORDER - 34

29. The lockbox contained two keys:  one for the front door knob and the other for the padlocks.  (Meyer at 211-12.)  With the code to the lockbox, one could open both the front door and the padlocks, remove the padlocks, and completely remove the lockbox from the front door knob.  (Meyer at 211-13.)

30. Safeguard's local contractor placed a first-time vacancy sticker on the residence at the Property that included Safeguard's 1-800 telephone number.  (Ex. 23 at 16; Meyer at 215-16.)  He did not put a "no trespassing" sign on the residence.  (Ex. A-9; Ex. A-10; Meyer at 214-15.)  There is no evidence in the record that the Lysyys called Safeguard's telephone number or learned from Safeguard how to remove the lockbox from the door.  (Meyer at 218.)

31. On October 17, 2019, SPS sent a letter to the Lysyys "to inform [them] that eviction proceedings on [the Property] ha[d] been initiated on 10/16/2019." (Ex. 1.)  The letter included contact information for SPS.  (Ex. 1.)  There is no evidence in the record that the Lysyys contacted SPS in response to this letter.  SPS eventually refunded $700 for eviction fees it charged to Ms. Lysyy's Loan on December 26, 2019, and January 9, 2020.  (Ex. 22 ¶ 20.)

32. Safeguard's contractor visited the Property a second time on October 25, 2019, to remove some debris.  (Meyer at 216-17.)

33. On November 1, 2019, McCarthy Holthus confirmed to SPS's Bankruptcy Department that Ms. Lysyy filed her bankruptcy petition before the trustee's sale took place and that her bankruptcy petition was valid.  (Ex. 22 ¶ 17; Pittman at 156.)  As a result, the trustee's sale was void.  (Ex. 22 ¶ 17.)  SPS then put a hold on all REO activity

and moved the Property out of REO status.  (Ex. 22 ¶ 17; Pittman at 189.)  Because Quality had not recorded a trustee's deed, no further action was required to rescind the trustee's sale.  (Ex. 22 ¶ 18; Pittman at 157, 189.)  No further REO activity has taken place at the Property since November 1, 2019.  (Ex. 22 ¶ 19; Pittman at 189.)

34.   On December 3, 2019, Mr. Kuzmenko called SPS as the Lysyys' representative and SPS gave him the code to the lockbox at the Property.  (Ex. A-4 at 657; Pittman at 181-83.)  Although the code documented in SPS's electronic file is incorrect, Mr. Pittman testified that the code in the notes was likely a typographical error because no one ever informed SPS, Safeguard, or anyone else that the code Mr. Kuzmenko received did not work.  (Pittman at 181-83.)  Furthermore, although SPS's extensive electronic records were admitted at trial (*see* Ex. A-4), no party presented evidence that either of the Lysyys called SPS about the locks on the Property.  Therefore, the court finds that Mr. Kuzmenko, and the Lysyys through Mr. Kuzmenko, were able to enter the Property and remove the locks placed by Safeguard by no later than December 3, 2019.

35.   Ms. Lysyy did not ask Mr. Kuzmenko if he had the code to the lockbox. (T. Lysyy at 43-44.)  She acknowledged at trial that if Mr. Kuzmenko had the code to the lockbox, that would mean that she and her husband were not locked out of the Property. (T. Lysyy at 49, 52.)

36.   On January 3, 2020, the Bankruptcy Court dismissed Ms. Lysyy's bankruptcy case.  (Ad. Fact # 8.)  Ms. Lysyy never moved to remedy Defendants' alleged

violation of the automatic bankruptcy stay while her bankruptcy case was pending.  (Ex. A-18; Pittman at 190.)

37.     In December 2019, SPS applied to register the Property in the City of Auburn's vacant property registration program.  (Ex. 5 at 1-3; Barack at 238.)  According to Christopher Barack, the City's Code Compliance Manager, property owners, banks, and mortgage lienholders are required to register vacant properties with the City.  (Barack at 224-25.)  The owner, bank, or lienholder must keep the property free of code violations, ensure that utilities are disconnected, and provide adequate lighting.  (Barack at 225; *see also* Ex. 5 at 1 (setting forth the requirements that must be met if a building is vacant for more than 30 days).)  When a property is registered in the program, a City code compliance officer visits the property to ensure there are no current code violations.  (Barack at 225-26.)  If the officer finds violations, the City contacts the registrant or its preservation company to remedy the violations.  (Barack at 226.)  The applicant for the vacant property registration program must also sign a trespass admonishment agreement that provides the Auburn police department authority to act as the agent for the owner, bank, or lienholder in the event of a trespass.  (Ex. 5 at 3; Barack at 226, 228-29.)

38.     When an owner, lienholder, or neighbor reports a property to the City as vacant, a code compliance officer conducts an independent assessment of whether the property is in fact vacant.  (Barack at 226-27.)  During the timeframe relevant to this action, if a code compliance officer confirmed that the property was vacant, the officer would place a "No Trespassing" sign on the property.  (Barack at 226-28.)  If the code

compliance officer found evidence that the property was occupied, however, the officer would not place a "No Trespassing" sign. (Barack at 227.)

39.     A code compliance officer inspected the Property on January 8, 2020, after SPS submitted its application for the vacant property registration program. (Ex. 5; Ex. A-24; Barack at 232-34.) Because the Property was vacant, the code compliance officer put up a "No Trespassing" sign. (Barack at 232-34; Ex. 23 at 3-5, 12.[14]) On January 9, 2020, the City issued a Notice to Correct to the Lysyys because the Property did not satisfy the conditions required for vacant property registration. (Ex. A-25; Barack at 235-36.)

40.     As the Property's owners of record, the Lysyys could have removed the "No Trespassing" sign without permission from the City and without any consequences. (Barack at 230.)

41.     SPS renewed the vacant property registration for the Property multiple times between 2019 and 2023. (Ex 5.)

42.     Based on the foregoing, the court finds that the City placed the "No Trespassing" sign on the Property because SPS, as lienholder, registered the Property in the City's vacant property registration program. The court further finds that the "No Trespassing" sign and the vacant property registration do not constitute evidence that SPS had taken possession of the Property in violation of the automatic bankruptcy stay.

---

[14] A separate no-trespassing sign stating, "This property is managed by Windermere Real Estate," was also placed at the property at some point. (*See, e.g.*, Ex. 23 at 8.) No witness was able to explain who placed this sign or when it was placed, and there was no testimony that the Lysyys or anyone else called the telephone number on that sign.

ORDER - 38

43.     Sometime after the City placed the "No Trespassing" sign on the Property—that is, sometime in January 2020—Ms. Lysyy drove by the Property. Seeing the locks and the "No Trespassing" sign made her upset and stressed. (T. Lysyy at 26.) Ms. Lysyy stopped going to the house for fear of being arrested. (T. Lysyy at 24-25.) Ms. Lysyy testified that she had felt stress about the Property before the locks were changed and the "No Trespassing" sign was placed on the Property, but seeing the locks and sign aggravated her stress. (T. Lysyy at 26.)

44.     Ms. Lysyy did not call the City or the Auburn Police Department to ask about the "No Trespassing" sign. (T. Lysyy at 38-39.) Instead, she and Mr. Lysyy asked Mr. Kuzmenko to figure out why the signs were placed. (T. Lysyy at 24-25, 31, 39.) She testified that she did not look closely at the sign and "absolutely" did not know who put the lockbox on the Property. (T. Lysyy at 40-42.)

45.     Mr. Lysyy testified that he could not enter the Property because of the "No Trespassing" signs and because he did not have keys. (V. Lysyy at 102.) He was afraid that if he tried to change the locks, someone would call the police and have him arrested. (V. Lysyy at 103.) Mr. Lysyy testified that Mr. Kuzmenko told him that he would be doing something illegal if he entered the Property. (V. Lysyy at 109-10.) No evidence was introduced at trial to suggest that Mr. Lysyy ever called the City or the Auburn Police Department about the "No Trespassing" sign.

46.     On February 5, 2022, Aleksandr Kanonik, an independent residential real estate appraiser, inspected and appraised the Property at Mr. Kuzmenko's request. (Ex. A-13; Kanonik at 242-44.) Mr. Kuzmenko let Mr. Kanonik into the residence at the

ORDER - 39

Property.  (Kanonik at 245.)  Mr. Kuzmenko also provided Mr. Kanonik documents to review in the course of performing his appraisal.  (Kanonik at 246-47.)  That Mr. Kuzmenko let Mr. Kanonik into the residence indicates that Mr. Kuzmenko was able to enter the Property in February 2022.

47.    In April 2022, Plaintiffs participated in an FFA mediation.  (*See* Ex. A-11.)  On May 2, 2022, as part of the mediation process, Grace Chu of McCarthy Holthus again provided Mr. Kuzmenko the code to the lock box on the front door of the Property.  (Ad. Fact # 9.)  As discussed above, however, the evidence introduced at trial shows that that Mr. Kuzmenko had access to the Property by at least December 3, 2019.

48.    Ms. Lysyy filed for bankruptcy two more times after her October 11, 2019 petition.  (Ad. Facts ## 6-8.)  Plaintiffs never moved to enjoin any alleged violation of the automatic bankruptcy stay in Ms. Lysyy's later bankruptcy actions or in this case.  (*See generally* Dkt.)

49.    Although Mr. Kuzmenko has had the lockbox code since at least December 3, 2019, the lockbox and padlocks remain installed at the Property.

50.    In its order on Defendants' second motion for summary judgment the court barred Plaintiffs from recovering damages for (a) loss or damage to personal property and (b) loss of ability to use, rent out, or sell the Property.  (*See* 2/20/25 Order at 23.)

51.    Mr. Lysyy testified that the Property had deadbolt locks on both the front and back exterior doors prior to Safeguard's entry.  Safeguard replaced these with knob locks.  Mr. Lysyy and Mr. Meyer of Safeguard estimated the cost to replace each with a deadbolt of his choice would be about $300 per lock.  (V. Lysyy at 103; Meyer at

ORDER - 40

220-21.)  In addition, the five padlocks caused physical damage because each installation involved 2 to 4 screws per side, creating holes that require removal, wood filler, and touch-up painting to match the original color.  (Meyer at 219-20.)  Mr. Meyer estimated that the total cost of removing the padlocks and repairing the holes would be "maybe a couple hundred dollars."  (Meyer at 220.)

52.    Ms. Lysyy testified that after she saw the "No-Trespassing" sign and that the locks on the Property had been changed, she felt stressed and would get migraines about ten times a year and insomnia two or three times a week.  (T. Lysyy 27-29.)  She further testified that she felt stress since moving to Fife in 2012 because she and her husband had been unable to make payments on the Loan since 2010, could not get a loan modification, were "being told that [they] did something wrong" by causing damage to their own house, and were feeling the pressure of pursuing this lawsuit.  (T. Lysyy at 52-53, 59, 60.)  Ms. Lysyy did not seek treatment for her headaches, insomnia, and anxiety.  (T. Lysyy at 54-55.)

53.    Mr. Lysyy testified that he suffered from a loss of appetite and became withdrawn as a result of being denied loan modifications, the Lysyys' inability to resolve issues with the Loan, the changing of the locks at the Property, and his family's growing debt.  (V. Lysyy at 104-05.)

**D.    Conclusions of Law**

1.    The court has federal question jurisdiction over this matter under 28 U.S.C. § 1331 and 11 U.S.C. § 362(k).  Venue is proper in this District pursuant to 28 U.S.C.

ORDER - 41

§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

2.      11 U.S.C. § 362(a) imposes an affirmative duty to discontinue post-petition collection actions.  *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1216 (9th Cir. 2002).  The filing of a bankruptcy petition operates as an automatic stay of "virtually all actions against the debtor to collect pre-petition debts[,]" including, in relevant part, "any act to obtain possession of property of the estate" or to "create, perfect, or enforce any lien against property of the estate[.]"  *In re Schwartz-Tallard*, 803 F.3d 1095, 1097 (9th Cir. 2015) (en banc); 11 U.S.C. § 362(a)(1), (3), (4).  Accordingly, the automatic bankruptcy stay was triggered when Ms. Lysyy filed her Chapter 13 bankruptcy petition at 9:10 a.m. on October 11, 2019.

3.      "[A]n individual injured by any willful violation of a stay provided by [§ 362(a)] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).  To prevail on a claim for willful violation of the automatic bankruptcy stay, the plaintiff must demonstrate by a preponderance of the evidence that "(1) a bankruptcy petition was filed; (2) the debtor is an individual; (3) the creditor received notice of the petition; (4) the creditor's actions were in willful violation of the stay; and (5) the debtor suffered damages."  *In re Jha*, 461 B.R. 611, 616 (Bankr. N.D. Cal. 2011) (citation omitted).  In this circuit, "[a] willful violation is satisfied if a party knew of the automatic stay, and its actions in violation of the stay were intentional."  *Koeberer v. Cal. Bank of Commerce (In re Koeberer)*, 632 B.R. 680, 687 (B.A.P. 9th Cir. 2021) (internal quotation marks and

citation omitted); *see also Morris v. Peralta (In re Peralta)*, 317 B.R. 381, 389 (B.A.P. 9th Cir. 2004) ("No specific intent is required; a good faith belief that the stay is not being violated 'is not relevant to whether the act was 'willful' or whether compensation must be awarded.'" (citation omitted)).  Knowledge of the bankruptcy filing is the legal equivalent of knowledge of the automatic stay.  *In re Ozenne*, 337 B.R. 214, 220 (B.A.P. 9th Cir. 2006) (citation omitted).

4.       SPS, as attorney-in-fact for the Trust, received notice of Ms. Lysyy's bankruptcy filing by no later than October 14, 2019.  Thus, by definition, SPS (and through SPS, the Trust) knew by no later than October 14, 2019, that the automatic stay had been triggered on October 11, 2019.  *In re Ozenne*, 337 B.R. at 220.  Nevertheless, rather than cease its REO activity, SPS did not take the Property out of REO status or put an end to REO activity until November 1, 2019, more than two weeks later.  By that point, SPS had notified Ms. Lysyy that it was initiating eviction proceedings, charged an eviction fee to Ms. Lysyy's Loan, and asked its vendors to enter the Property and replace the locks on the Property with its own locks.  The court concludes that this conduct constituted "act[s] to obtain possession of property of [Ms. Lysyy's bankruptcy] estate" or to "create, perfect, or enforce any lien against property of the estate" within the meaning of 11 U.S.C. § 362(a).  Therefore, the court concludes that SPS and the Trust willfully violated the automatic stay.

5.       SPS argues that it did not willfully violate the stay because it was entitled to continue REO activities while it awaited McCarthy Holthus's opinion on the timing and validity of Ms. Lysyy's bankruptcy petition.  The court is not convinced.  As discussed

above, SPS knew, by no later than October 14, 2019, that the automatic stay had been triggered on October 11, 2019.  As a result, any further action to "obtain possession of" the Property or to "create, perfect, or enforce any lien against" the Property violated the stay.  11 U.S.C. § 362(a), (k).  To the extent SPS complains that it did not have actual knowledge of the bankruptcy filing because Quality and Ms. Baker entered their notes through the "wrong bankruptcy process" or under "the wrong task," the Ninth Circuit has made clear that delays in remedying stay violations caused by a creditor's own "internal disorder do[] not excuse it from complying with the automatic stay." *Eskanos & Adler*, 309 F.3d at 1215.

6.      The court concludes, however, that SPS's violations of the automatic stay were remedied when it refunded the $700 in eviction fees it had charged to Ms. Lysyy's account and provided the lockbox code to the Lysyys' representative, Mr. Kuzmenko.  In any event, the automatic stay indisputably ended when Ms. Lysyy's bankruptcy case was dismissed in January 2020.

7.      Section 362(k) permits injured debtors to sue for "actual damages, including costs and attorneys' fees" arising from a violation of the automatic stay. 11 U.S.C. § 362(k)(1).

8.      Ms. Lysyy seeks an award of $100,000 in emotional stress damages.  (Pls. Final FOFCOL at COL ¶ 7.)  To recover damages for emotional distress under § 362(k), the debtor must "(1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in

ORDER - 44

the bankruptcy process)." *In re Dawson*, 390 F.3d 1139, 1149 (9th Cir. 2004), *abrogation on other grounds recognized in In re Gugliuzza*, 852 F.3d 884 (9th Cir. 2017). "Fleeting or trivial anxiety or distress does not suffice to support an award; instead, an individual must suffer significant emotional harm." *Id.* (citation omitted).

9.      Here, Ms. Lysyy complains of migraines, stress, and insomnia.  It is not clear, however, whether and to what extent Ms. Lysyy's emotional distress stems specifically from Defendants' conduct in violation of the automatic bankruptcy stay, as opposed to general emotional distress arising from being in default on the Property, her inability to obtain loan modifications since 2012, the stress of the bankruptcy proceedings themselves, the City's placement of the "No Trespassing" sign pursuant to its vacant property registration program, and pressure resulting from this litigation.  Accordingly, the court concludes that $10,000 will sufficiently compensate Ms. Lysyy for the emotional distress caused specifically by Defendants' conduct in violation of the automatic stay.

10.      Ms. Lysyy seeks damages of $900 to cover locksmith and carpentry costs that she expects to incur in replacing the deadbolts at the Property and repairing the damage caused when Safeguard installed the padlocks at the Property.  (Pls. Final FOFCOL at COL ¶ 8.)  This amount is based on the testimony of Mr. Lysyy and Mr. Meyer.  (*See id.*)  The court grants this request.

11.      Ms. Lysyy seeks an award of attorneys' fees and costs.  (Pls. Final FOFCOL at COL ¶ 9.)  In a § 362(k) action, "actual damages" recoverable for a violation of the automatic bankruptcy stay include "an award of all attorney's fees reasonably

incurred to remedy a stay violation, including fees incurred in prosecuting [a] damages action" under § 362(k). *In re Schwartz-Tallard*, 803 F.3d at 1097. An award of attorney's fees and costs is mandatory under § 362(k). *Id.* at 1099. However, "[o]nly an award of fees reasonably incurred is mandated by the statute; courts awarding fees under § 362(k) thus retain the discretion to eliminate unnecessary or plainly excessive fees." *Id.* at 1101 (citation omitted). Therefore, having found that SPS violated the automatic bankruptcy stay, the court concludes that Ms. Lysyy is entitled to an award of attorney's fees and costs. Counsel for Ms. Lysyy shall file a motion for an award of attorneys' fees and costs within 21 days after entry of this order. Counsel is placed on notice that the court will carefully scrutinize Ms. Lysyy's attorneys' fees motion to ensure that the requested fees are segregated from unsuccessful claims and were necessarily incurred in litigating Ms. Lysyy's § 362(k) claim.

12. Ms. Lysyy seeks an award of $125,000 in punitive damages. (Pls. Final FOFCOL at COL ¶ 10.) An award of punitive damages requires the plaintiff to prove that the defendant had "a reckless and callous disregard for the law or the rights of others or where the conduct is malicious, wanton, or oppressive." *In re Snowden*, 769 F.3d 651, 657 (9th Cir. 2014). Ms. Lysyy argues that the court should consider Safeguard's removal and replacement of the locks at the Property worthy of punitive damages because it was accomplished in direct violation of the Washington Supreme Court's opinion in *Jordan v. Nationstar Mortgage, LLC*, 374 P.3d 1195 (Wash. 2016). (Pls. Final

ORDER - 46

FOFCOL at FOF ¶ 39;[15] *see also* Pls. Resp. to 2d MSJ at 4 (arguing in December 2024 that *Jordan* prohibits a lender from taking possession of a property before the completion of a foreclosure sale).)

13.     The court agrees with Ms. Lysyy that punitive damages are warranted, but not in the amount she seeks.  In *Jordan*, the Washington Supreme Court evaluated deed of trust provisions identical to those at issue here that purported to authorize a lender to enter the borrower's property after default and prior to foreclosure.  *Jordan*, 374 P.3d at 1199.  The *Jordan* court clarified that contract provisions in a deed of trust that permit a lender or its servicer to access a borrower's real property before the completion of a foreclosure sale violate RCW 7.28.230, which prohibits a lender from recovering possession of a borrower's property prior to foreclosure.  *Jordan*, 374 P.3d at 1200-02.  This is true even where the lender (or here, loan servicer) finds that the property at issue is no longer occupied.  *See id.*  The *Jordan* Court concluded that:

> By changing the locks [the loan servicer] took possession of the property. Since these actions are authorized by the entry provisions, the entry provisions allow the lender to take possession of the property.  Because Washington law prohibits lenders from taking possession of the borrower's property before foreclosure, the provisions are in conflict with state law.

[15] Ms. Lysyy also relies on a case she cites as "*Jordan v. Nationstar Mortgage, LLC*, 185 Wn. App. 977, 344 P.3d 1255 (2015), *aff'd*, 185 Wn.2d 876, 374 P.3d 1195 (2016)." (*See* Pls. Final FOFCOL at FOF ¶ 39.)  This Washington Court of Appeals case, however, does not exist. To the contrary, the Washington Supreme Court issued its decision in *Jordan* in response to questions certified to it by the United States District Court for the Eastern District of Washington.  *See Jordan*, 374 P.3d at 1198.  Thus, there was no Washington Court of Appeals case for the Supreme Court to affirm.

ORDER - 47

*Id.* at 1202; *see also Kautsman v. Carrington Mortg. Servs., LLC*, No. C16-1940JCC, 2017 WL 4354873, at \*3 (W.D. Wash. Oct. 2, 2017) (observing that changing the locks on the residence and forcing the homeowner to contact the loan servicer for a lockbox code in order to gain re-entry prior to completing a foreclosure action amounted to unlawful possession by the loan servicer) (citing *Jordan*, 374 P.3d at 1200-01); *see also Bess v. Ocwen Loan Servicing LLC*, 334 F.R.D. 432, 434 (W.D. Wash. 2020); *Bund v. Safeguard Props. LLC*, No. C16-0920MJP, 2021 WL 1546086, at \*2-3 (W.D. Wash. Apr. 20, 2021) (observing that the Washington Supreme Court "acknowledged that 'the [deed of trust's entry] provisions authorize the lender to enter and rekey the property solely upon default, regardless of whether the borrower has abandoned the property" and are therefore unlawful) (citing *Jordan*, 374 P.3d at 1199)).  Although Ms. Lysyy has raised her *Jordan* argument multiple times in this litigation, Defendants have never meaningfully addressed it.  (*See, e.g.*, 2d MSJ Reply (Dkt. # 98); Defs. Trial Br.) Furthermore, the evidence before the court suggests that the foreclosure sale of the Property was never completed because Quality did not record a trustee's deed after the sale.  The court concludes, therefore, that the Trust and SPS recklessly disregarded Washington law and the bankruptcy stay when they secured the Lysyys' Property by changing the locks and rekeying the Property just days after SPS received notice that Ms. Lysyy filed her bankruptcy petition and before the foreclosure sale was completed.  As a result, the court awards Ms. Lysyy $10,000 in punitive damages.

14.    Ms. Lysyy asks the court to enter judgment against SPS, Safeguard, and the Trust jointly and severally.  (Pls. Final FOFCOL at COL ¶ 11.)  Ms. Lysyy, however,

introduced no evidence that Safeguard was aware that she had filed her bankruptcy petition or that the automatic bankruptcy stay was in effect. Therefore, the court concludes that Safeguard is not liable for damages under § 362(k) and will enter judgment against SPS and the Trust, jointly and severally.

## V.   OTHER REMAINING MATTERS

The court takes this opportunity to resolve some outstanding issues in this matter.

First, the court dismisses the civil contempt proceedings that Magistrate Judge Peterson initiated against Mr. Lysyy in May 2025 because subsequent testimony by the Lysyys in the June 2025 hearings and during trial indicates that Mr. Lysyy was not entirely at fault for his failure to attend the judicial settlement conference on May 7, 2025.

Second, the court reiterates that the sanctions it issued when the Lysyys failed to attend their depositions in July 2024 remain in effect. The court will include the $4,500 sanction award in its final judgment in this matter.

Third, the court discharges its June 17, 2025 order directing Plaintiffs to show cause why the court should not dismiss this matter as a sanction for violating the pretrial order. (*See* 6/17/25 Order.)

Finally, the court concludes, based on the facts adduced at trial and in the hearings preceding trial, that the Lysyys placed far too much trust and confidence in their friend and advisor, Peter Kuzmenko. The court is left with the impression that Mr. Kuzmenko's advice to the Lysyys was questionable at best, was not directed toward the efficient resolution of the issues surrounding the Property and the automatic bankruptcy stay, and

ORDER - 49

strayed dangerously close to engaging in the unauthorized practice of law. The court is confident that if the Lysyys had communicated directly with Defendants, many of the issues raised in this litigation could have been resolved years ago. The court recommends to the Lysyys that they retain qualified counsel to assist them if they encounter further legal issues regarding the Property.

## VI.   CONCLUSION

For the foregoing reasons, the court ORDERS as follows:

1.      Defendants' motion for summary judgment on Plaintiffs' quiet title claim is GRANTED and Plaintiffs' cross-motion for summary judgment is DENIED. Plaintiffs' quiet title claim is DISMISSED without prejudice to raising it in the future if Defendants fail to initiate judicial or nonjudicial foreclosure proceedings before the statute of limitations expires.

2.      The court GRANTS Defendants' motion for judgment on partial findings regarding Mr. Lysyy's statutory standing to pursue an 11 U.S.C. § 362(k) claim for violation of the bankruptcy stay (Dkt. # 174). Mr. Lysyy's § 362(k) claim is DISMISSED with prejudice.

3.      The court finds in Ms. Lysyy's favor on her 11 U.S.C. § 362(k) claim for violation of the automatic bankruptcy stay. Ms. Lysyy is AWARDED $10,000 in emotional distress damages, $900 in damages for repair and replacement of the locks Safeguard installed in October 2019, and $10,000 in punitive damages.

4.      Defendants are AWARDED $4,500 in costs and attorneys' fees as a sanction for Plaintiffs' failure to appear at their depositions in July 2024.

5.    Counsel for the parties are ORDERED to file their motions for attorneys' fees and costs by no later than **21 days** after entry of this order.  These motions shall be noted as 21-day motions pursuant to Local Rules W.D. Wash. LCR 7(d)(3).  The court will enter final judgment after it resolves the motions for attorneys' fees and costs.

Dated this 14th day of April, 2026.

JAMES L. ROBART
United States District Judge

ORDER - 51